**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THOMAS GIEDGOWD | : | CIVIL ACTION |
| | : | |
| v. | : | NO.  20-6184 |
| | : | |
| CAFARO GROUP, LLC, *et al.* | : | |

## <u>MEMORANDUM</u>

KEARNEY, J.                                                                                                    October 26, 2021

Retirement plan advisory and consulting firm Cafaro Group, LLC fired sixty-six-year-old retirement plan consultant Thomas Giedgowd five months after a change in ownership where younger supervisors quietly disliked his sales and management style. Mr. Giedgowd sued his former employer for age discrimination under Pennsylvania Law. The jury returned a verdict in favor of Mr. Giedgowd finding his age a determinative factor in Cafaro's decision to terminate him. The jury awarded Mr. Giedgowd: (1) $180,000 in compensatory damages; (2) $114,000 in lost back pay; and (3) $157,500 in front pay. Cafaro now moves for judgment as a matter of law, for a new trial, and if we deny its motion for a new trial, we do so on the condition Mr. Giedgowd accepts remittitur. Mr. Giedgowd moves to mold the judgment to include prejudgment interest on the jury's award of back pay.

The jury heard all the proffered evidence and decided to believe Mr. Giedgowd and disbelieve his former employer's inconsistent testimony as to why and how it fired him. A jury could readily find evidence Cafaro fired him without earlier notice after finding his age a determinative factor and set damages based on the evidence. The case presented a clash in cultures between a younger and new management team and Mr. Giedgowd's successful but now unfavored style. The jury decided who to believe. We deny Cafaro's motion. We grant Mr. Giedgowd's unopposed motion to mold the judgment to include prejudgment interest.

## I.   Evidence adduced at trial.

Thomas Giedgowd attended West Chester University and graduated with a bachelor's degree in administration with a concentration in accounting.[1] Mr. Giedgowd obtained his master's degree in taxation from Villanova University; he is a certified public accountant.[2] Mr. Giedgowd also obtained his Series 65 license in 1999 allowing him to provide investment advice.[3] Mr. Giedgowd's Series 65 license expired by trial, although Cafaro did not adduce evidence on the date it expired.[4]

Mr. Giedgowd worked in the accounting field for approximately twenty years.[5] Mr. Giedgowd eventually left the accounting field, and Armstrong, Doyle and Carroll – predecessor of Carroll Consultants – hired him in 1994.[6] Carroll Consultants, a retirement plan advisory and consulting firm, employed Mr. Giedgowd as a retirement plan consultant and he eventually rose to become its chief investment officer and chief compliance officer.[7] Mr. Giedgowd reported to the firm's owner Marcie Carroll.[8] Ms. Carroll is a licensed advisor, but she concentrated her time on running the firm, not advising.[9] Carroll Consultants employed Mark Ries, also a licensed retirement plan consultant.[10] Carroll Consultants hired Mr. Ries in 2016, and Mr. Ries reported to Mr. Giedgowd, who then had over fifteen years of advising experience and trained him about advising retirement plans.[11]

Mr. Giedgowd maintained the role of primary advisor at Carroll Consultants due to having the most years of experience, and he, along with Ms. Carroll, grew Carroll Consultants's advising practice to approximately 105 clients at the time Ms. Carroll sold the firm in October 2018.[12] Mr. Giedgowd estimated he spent about fifty percent of his time advising his retirement plan clients.[13] Carroll Consulting paid performance-based bonuses to Mr. Giedgowd every year.[14] He also testified his degree and certification in tax assisted his role as retirement plan

consultant because he could advise on the tax consequences to his clients.[15] No employer ever terminated, laid off, suspended, written up, or disciplined Mr. Giedgowd.[16] Ms. Carroll always provided him positive feedback; no client ever offered negative feedback.[17]

Co-employee Mark Ries did not enjoy the same level of success with Carroll Consulting. Ms. Carroll removed Mr. Ries from an account after he sent an inappropriate email to a client who became upset, and Mr. Giedgowd had to smooth the relationship over to retain the client.[18] Mr. Ries also received a "one and a half, two-week" suspension due to his conduct.[19]

Carroll Consultants also employed Buzz Hartsig, an administrative manager, and Michele Conner, an account manager, who provided administrative support to Mr. Giedgowd and Mr. Ries in addition to performing other client-facing duties.[20] Carroll Consultants hired Ms. Conner "around 2012."[21] She did not have her advisory license.[22] Ms. Conner's primary responsibility included administrative tasks and providing support to Mr. Giedgowd and Mr. Ries, such as "sending out emails, following up on open items from the advisory meetings . . . help with PowerPoint presentations, things of that nature."[23] She did not advise clients because she did not have an advisory license.[24]

Mr. Giedgowd maintained a private tax practice and coached high school basketball, which sometimes required him to leave early during work hours.[25] Carroll Consulting did not criticize Mr. Giedgowd for his outside interests given his work effort and success.[26]

### *Cafaro acquires Carroll Consultants*.

Cafaro Group, LLC acquired Carroll Consultants in October 2018.[27] Sixty-six-year-old Mr. Giedgowd then began working with the younger management team from Cafaro.[28] He was Cafaro's oldest employee.[29] Cafaro hired all of Carroll Consultants' employees except two – Yvonne Macario and Cathie Cissone – both of whom were over the age of fifty-five.[30] While

Wayne Greenleaf – an owner of Cafaro – testified Cafaro did not hire these employees because they were not needed in Cafaro's structure, Jamie Greenleaf – also an owner of Cafaro– testified those older employees chose not to join Cafaro.[31] Mr. Giedgowd's base pay stayed the same, but his pay functionally decreased because Cafaro no longer offered bonuses as Carroll Consulting did.[32] Mr. Giedgowd asked Brian Clark, Director of Operations, to adjust his salary to a higher amount after receiving his employment agreement for Cafaro, but Mr. Clark refused because Mr. Giedgowd asked for too much.[33]

Cafaro hired Mr. Ries and Ms. Conner as retirement plan investment advisors.[34] Cafaro also had a retirement plan advisor pre-acquisition – Amy Kinsman – who continued to be employed.[35] The retirement plan advisors all reported to Mr. Clark.[36]

Following the acquisition, Cafaro tasked Mr. Clark with evaluating the "advisory side" of the business, including potential staffing inefficiencies with the retirement plan advisors.[37] Mr. Clark described this as a three-step process: (1) learning the Carroll Consulting business; (2) "normalizing the jobs;" and (3) evaluating staffing.[38]

As part of "normalizing the jobs," Mr. Clark created the Cafaro job description for the retirement plan advisor role.[39] The job description provided the retirement plan advisor "[m]ay coordinate the work of administrative support staff and will provide support to [Cafaro Group] partner advisors on larger relationships" and the position required "an S65 or S66" license.[40] Ms. Conner did not have a S65 or S66 license at the time Cafaro hired her as a retirement plan advisor. She did not obtain her license before leaving Cafaro despite Cafaro providing "extensive training."[41] While the job description purportedly allowed the retirement plan advisors to use administrative support, Cafaro did not have administrative support staff and Ms. Conner no longer provided such support in her new role.[42]

4

Mr. Clark also looked at retirement plan advisor staffing.[43] Mr. Clark and Cafaro determined it had too many retirement plan advisors following the acquisition and decided to eliminate one of the positions.[44] Cafaro adduced no documents at trial describing this strategy; it relied on testimony based on recall from months earlier.[45] Mr. Clark, along with Buzz Hartsig, Ms. Greenleaf, and Mr. Greenleaf – all decisionmakers – undertook the evaluation process to determine which position would be eliminated, but Mr. Clark made the ultimate decision to terminate Mr. Giedgowd.[46]

Mr. Clark testified he considered all of the retirement plan advisors for elimination, but "[they] concluded pretty quickly that it wouldn't make sense [to terminate Amy Kinsman because] [s]he was servicing a large book of clients[,] [s]he was already in the job as we are defining it, and she was servicing our largest revenue clients by far."[47] Mr. Clark solicited feedback on Mr. Giedgowd, Mr. Ries, and Ms. Conner to decide which one to eliminate.[48]

Mr. Clark received feedback on Ms. Conner. He testified Ms. Conner "was a workhorse," "managed essentially relationships with 100 different clients . . . same as Amy," "was very knowledgeable" about the clients and their plans, and had a reputation "of someone who works very hard and would like to do more."[49] Mr. Clark testified her "intimate knowledge of [the] clients was irreplaceable" and losing her would be "disruptive."[50] Mr. Clark acknowledged Ms. Conner did not have a Series 65 or 66 license, and explained she could fulfill this role despite lacking the requirement Mr. Clark himself put into the job description because advising clients is only a small part of the role and a licensed advisor, such as Ms. Greenleaf, would provide any advice needed.[51] Mr. Hartsig swore this role required a license for fifty percent of the work.[52] Ms. Greenleaf described Ms. Conner as "a better performer" in the role of retirement plan advisor even though she did not have the required license.[53]

Mr. Clark also received feedback on Mr. Ries. Mr. Clark swore Mr. Ries had "a strong investment background," "very good presentation skills . . .[and] listens well . . . responds well," "was doing a really good job on managing the relationships he had," and he "managed [Cafaro's] book of individual[s]" clients.[54] He swore Mr. Ries "was the best suited to continue to service [the individual] clients" because of his background in financial planning and because individual advising required "one-on-one relationships," which Cafaro did not want to displace by terminating Mr. Ries.[55] Mr. Ries also received negative feedback, including "his directness could sometimes be aloof or abrasive."[56] Carroll Consulting earlier suspended Mr. Ries for about two weeks and removed him from an account for him sending an inappropriate email to a client.[57]

Mr. Clark also received feedback on Mr. Giedgowd. Mr. Clark swore he decided to terminate Mr. Giedgowd for "a bunch of reasons."[58] Mr. Clark testified Mr. Giedgowd had less responsibilities at Cafaro than at Carroll Consulting because he no longer needed to "manage the investment analysis . . . [or] manag[e] compliance for the firm."[59] Ms. Carroll and Mr. Hartsig reported these tasks comprised forty to fifty percent of Mr. Giedgowd's job at Carroll Consulting.[60] Mr. Clark also testified Mr. Giedgowd had "different issues" with "client skills."[61] Mr. Giedgowd did not present well, at times went to meetings unprepared, and "the clients are lost" during his presentations.[62] Mr. Clark received negative feedback from Ms. Greenleaf about two meetings she attended with Mr. Giedgowd while employed at Cafaro.[63] Mr. Clark also received negative feedback from Mr. Hartsig about Mr. Giedgowd not responding to clients' emails while at Carroll Consulting, leading Mr. Hartsig to monitor his emails which Mr. Clark considered "a big piece" of his decision to terminate Mr. Giedgowd.[64]

Mr. Clark also received feedback from Mr. Hartsig about Ms. Conner complaining Mr. Giedgowd continued to give her administrative work, despite her job description changing, and

Mr. Clark testified he observed this as well which "really bothered [him]."[65] Despite these complaints, Mr. Clark never approached Mr. Giedgowd to discuss this with him.[66] Mr. Clark also described Mr. Giedgowd as "the least coachable," and found "[Mr. Giedgowd] had an inability to read a room," which he saw as "a DNA issue . . . an emotional intelligence kind of thing."[67] No client ever asked for Mr. Giedgowd to be removed from their account and "the majority of clients liked him."[68] Despite these factors weighing on Mr. Clark's decision, Mr. Clark testified – contrary to the Greenleafs' testimony – "it was not [a performance-related termination] . . . we didn't terminate him for performance."[69]

Ms. Greenleaf also testified she did not feel comfortable with Mr. Giedgowd's tax business, describing it as "a conflict of interest" and "concerning."[70] Cafaro did not document Mr. Giedgowd's performance issues, and no one ever addressed the perceived performance issues with Mr. Giedgowd during his tenure at Cafaro.[71] Cafaro had no documentation of this overarching evaluation process taking place.[72]

### *Cafaro terminates Mr. Giedgowd.*

Mr. Hartsig and Mr. Clark met with Mr. Giedgowd on Friday, March 22, 2019 to terminate him.[73] Mr. Giedgowd worked for Cafaro as a retirement plan advisor for five months before his termination.[74]

Despite Mr. Clark being the ultimate decision maker, Mr. Hartsig "took the lead" in the conversation because he knew Mr. Giedgowd for a longer amount of time.[75] Mr. Giedgowd testified Mr. Hartsig did not provide a reason for his termination.[76] Mr. Clark testified Mr. Hartsig told Mr. Giedgowd he was terminated due to reorganization.[77] Mr. Hartsig testified he did not provide an explanation to Mr. Giedgowd for his termination and neither did Mr. Clark.[78]

During the meeting, Mr. Hartsig brought up retirement.[79] Mr. Hartsig terminated Mr. Giedgowd, and despite bringing up retirement, testified "there was no option to retire . . . [but] there was an option if he wanted to state that he was retiring but he was being terminated."[80] Mr. Hartsig explained he thought it beneficial for Mr. Giedgowd to say he retired, rather than Cafaro terminated him, because "he had a tax practice . . . [and] maybe it's easier [to tell his tax clients] . . . I decided to retire from that part of my life . . . and get back into tax."[81] He thought it would similarly benefit Cafaro for Mr. Giedgowd to announce he retired "to help transition clients, over, you know, if he did want to call people, you know, go ahead. Not that I'm being terminated basis but I'm leaving kind of on my own, you know, here's the new person that's going to run your plan for you, goodbye."[82] Before this meeting, Mr. Giedgowd did not express an interest in retiring.[83] Mr. Hartsig did not give Mr. Giedgowd the option to resign or say he resigned.[84]

Cafaro offered conflicting testimony about the effective date of Mr. Giedgowd's termination. Mr. Clark testified Mr. Hartsig terminated Mr. Giedgowd effective immediately on Monday, March 25, and Mr. Hartsig testified he terminated Mr. Giedgowd "effective immediately" on Friday, March 22.[85] Either way, Mr. Giedgowd requested to think about whether he would stay an additional two weeks to tell his clients he retired.[86]

Mr. Giedgowd went home to his wife "visibly shaken," "embarrassed [because] I have to tell my kids, friends of mine. I had relationships with clients for like, over 20 years, and – doing good advisory work, and now I have to explain to them that I got, you know, let go. Don't even know why I got let go."[87] Mr. Giedgowd felt "[his] name is getting dragged in the mud" because of the post-lawsuit criticisms in his performance, "but none of that was ever brought up to [him] before [he] got terminated and it still sticks with [him] today."[88]

He returned on Monday, March 25 to tell Cafaro he would not lie to his clients, but he would stay two weeks if he could tell them Cafaro terminated him.[89] Mr. Giedgowd spoke to Mr. Hartsig on Monday to inform him of this decision.[90] Mr. Hartsig called Mr. Clark, and Mr. Hartsig and Mr. Clark agreed Mr. Giedgowd could not work the next two weeks.[91] Mr. Hartsig returned and told Mr. Giedgowd "no way . . . get out of here . . . or you're out of here."[92]

### Cafaro makes Eileen Mahoney a retirement plan advisor.

Eileen Mahoney worked for Cafaro before it acquired Carroll Consultants as the director of client services.[93] Ms. Mahoney had a Series 65 license.[94] Ms. Conner later left Cafaro in 2020.[95] OneDigital then acquired Cafaro in January 2020.[96] Eileen Mahoney became a retirement plan advisor after January 2020.[97]

### Mr. Giedgowd's post-Cafaro work life.

Mr. Giedgowd found a new job two to three months after his termination.[98] He works for a company called Voluntary Benefits at Work, which provides him commission-based pay for selling long-term care insurance.[99] He does not receive a salary.[100] Mr. Giedgowd works twenty-five hours per week at this job.[101] He is an independent contractor.[102] He still coaches basketball and maintains his individual tax practice.[103] Mr. Giedgowd testified COVID "took a big hit on employers offering these voluntary benefits," but he anticipates the amount he earns from Voluntary Benefits at Work will increase.[104]

Mr. Giedgowd testified he made $89,000 at Cafaro before termination, and from May 2019 to the date of trial, he made $14,500 from Voluntary Benefits at Work.[105] In the same timeframe, Mr. Giedgowd estimated he would have made $207,000 at Cafaro, for a loss of $190,000 in back pay.[106] Mr. Giedgowd estimated his loss of future pay from 2021 to 2022 would be approximately $67,000.[107] On cross-examination, Mr. Giedgowd clarified his earnings

from Voluntary Benefits at Work. He testified he made nothing in 2019 because he made no sales.[108] In 2020, he made "around . . . $10,000" and in 2021, he made around $2,500.[109] He collected unemployment benefits in 2019 and 2020.[110] He has not looked for another job since Voluntary Benefits at Work hired him.[111]

Mr. Giedgowd also explained he "live[s] five minutes from [his old] office . . . and, you know, when [he] go[es] to Wegmans, which is right by [his] old office . . . [he] see[s] this, and it bothers [him] . . . two years after."[112] Mr. Giedgowd also "worr[ies] about providing for [himself] financially."[113] Mr. Giedgowd is not aware of clients who know Cafaro terminated him.[114]

## II.     Analysis

Cafaro now moves for judgment as a matter of law, for a new trial, and if we deny its motion for a new trial, we do so on the condition Mr. Giedgowd accepts remittitur. We deny its motion.

### A.     We deny Cafaro's renewed motion for judgment as a matter of law.

A motion for judgment as a matter of law under Rule 50(b) "should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability."[115] We may grant the motion only if "the record is critically deficient of the minimum quantum of evidence to sustain the verdict."[116] While judgment as a matter of law should be granted sparingly, a "scintilla of evidence" is insufficient to sustain a jury's verdict.[117] "The question is not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly have found its verdict."[118]   In considering a motion under Rule 50(b), we do not "weig[h] the evidence,

determin[e] the credibility of witnesses, or substitut[e] our own version of the facts for that of the jury."[119]

Cafaro makes several arguments for judgment as a matter of law but they can be addressed as Mr. Giedgowd failing to adduce sufficient evidence for a jury to find (1) age as the but-for cause of his termination; (2) Mr. Giedgowd is entitled to front pay and back pay; and (3) Mr. Giedgowd is entitled to compensatory damages. We disagree.

### 1. A reasonable jury could find age the but-for cause of Mr. Giedgowd's termination.

#### a. A reasonable jury could find age the but-for cause of Mr. Giedgowd's termination despite his testimony about requesting a raise.

Cafaro first argues a reasonable jury could not find age the but-for causation because Mr. Giedgowd offered an alternative reason for his firing—his request for a raise. Cafaro relies on two district court cases from the Middle District of Pennsylvania to support its argument.[120] In *Heverling*, Judge Conner dismissed the plaintiffs' complaint alleging, amongst other things, violation of Title VII for the use of sexual and homophobic slurs, because the plaintiffs alleged "*two* primary reasons for their terminations: (1) participation in the Title VII investigation and (2) reporting noncompliance with the FDA consent decree."[121] Judge Conner found "Plaintiffs' *allegata* are thus logically incompatible with but-for causation" because they "themselves alleged an alternative basis for the adverse employment action . . . [so they] cannot show that their protected activity was the but-for causation of their terminations." In *Burton*, Judge Rambo granted summary judgment in favor of the employer on the employee's claims for discrimination and retaliation due to his race and reporting sexual comments in violation of Title VII and the PHRA.[122] The plaintiff based both claims partly on his supervisor issuing him a "Supervisor's Notation," a written form of discipline.[123] In finding in favor of the employer, Judge Rambo

found "the mere fact that [the plaintiff] is asserting both discrimination and retaliation claims as to the Supervisor's Notation is fatal to his retaliation claim as the prima facie case of retaliation requires the plaintiff to show that the desire to retaliate was the sole basis, or the but-for cause, of the challenged employment action."[124] He continued, "[the plaintiff] cannot properly argue that the Supervisor's Notation was issued as both a form of discrimination and retaliation for [him] making complaints to his supervisors."[125]

Mr. Giedgowd proceeded to trial on one claim: Cafaro violated Pennsylvania Law firing him because of his age. Both cases are procedurally and substantively distinguishable because neither address age-based discrimination and neither dealt with trial testimony, as we have here. Second, the testimony Cafaro attempts to rely on does not establish Mr. Giedgowd thought Cafaro fired him because he requested a raise. Cafaro relies upon the following testimony to support its argument:

> Q: And because of that, you thought you were targeted for termination because you had asked for more money. That's what your testimony was. Correct?
>
> A: If that's what it says, then yes.[126]

During this exchange, Cafaro's attorney probed Mr. Giedgowd about his earlier deposition testimony. While Cafaro attempts to construe this testimony as Mr. Giedgowd stating he thought Cafaro targeted him because he asked for a raise, the testimony does not support this theory. Cafaro's attorney said (1) "you thought you were targeted for termination because you had asked for more money," then states (2) "[t]hat's what your testimony was," then asks him (3) "correct?" Mr. Giedgowd's response "if that's what it says, then yes" at best confirmed he previously testified to counsel's first statement, and at worst, only agrees he said this statement "if that's what it says." But counsel never showed Mr. Giedgowd the statement, sought for Mr.

Giedgowd to definitively confirm his deposition testimony, or attempted to introduce his deposition testimony to make the point it now asks us to accept. This ambiguous testimony is insufficient to establish Mr. Giedgowd testified to another reason for his termination. The jury heard all the evidence and made the credibility decisions.

Even assuming Mr. Giedgowd testified he thought Cafaro targeted him because he asked for a raise, our Court of Appeals has explicitly held "[w]e do not require that age discrimination be the sole cause for an adverse employment decision to prevail on an age discrimination claim."[127] Rather, age must be "a motivating or determinative cause of termination."[128] We deny Cafaro's first argument regarding Mr. Giedgowd's testimony on alternative motivation for termination.

> **b.      We will not disturb the jury's verdict finding age a determinative factor in Mr. Giedgowd's termination because it is supported by the evidence in the record.**

Cafaro next argues no reasonable jury could have found for Mr. Giedgowd because – in isolation – (1) offering retirement as an option cannot establish but-for causation; (2) failing to inform an employee of poor performance cannot establish but-for causation; and (3) being the oldest employee cannot form but-for causation.[129] Cafaro seemingly thinks the jury merely heard evidence about these three topics and nothing else.

We summarize the relevant evidence the jury heard. The jury heard conflicting testimony about the reason for Mr. Giedgowd's termination from decision makers Mr. Clark, Ms. Greenleaf, and Mr. Greenleaf.[130] They heard testimony Cafaro kept an unlicensed individual in the role of retirement plan advisor despite themselves writing a job description requiring the individual fulfilling the role be licensed.[131] They heard conflicting evidence of the justification for doing so.[132] They also heard Cafaro kept a retirement plan advisor who Carroll Consulting

suspended for about two weeks and removed him from an account due to an inappropriate email.[133] They heard testimony about the positive work attributes of those employees as well.[134] They also heard the positive and negative work attributes about Mr. Giedgowd, including from Cafaro employees and his previous employer, Ms. Carroll, and testimony about Mr. Giedgowd's performance.[135] They heard evidence of Mr. Giedgowd's degrees, experience, and qualifications.[136]

They heard of the "evaluation" Mr. Clark, Mr. Hartsig, Ms. Greenleaf, and Mr. Greenleaf undertook due to purported overstaffing.[137] They heard Cafaro had no documents, including no emails, to show this evaluation took place or if management thought the office was overstaffed.[138] They heard Cafaro could produce no document describing employees', including Mr. Giedgowd's, performance.[139] They heard evidence no one ever addressed perceived performance issues with Mr. Giedgowd.[140]

They also heard evidence of Mr. Giedgowd's termination meeting. They heard conflicting evidence about the effective date of Mr. Giedgowd's termination.[141] They heard conflicting evidence about whether Mr. Giedgowd received a reason for his firing.[142] They heard Mr. Hartsig testify he offered Mr. Giedgowd the option to retire, but not the option to resign.[143] They heard evidence after Mr. Giedgowd refused to lie to clients, Cafaro refused to let him work an additional two weeks.[144] They heard Cafaro fired its oldest employee – Mr. Giedgowd.[145]

They heard much more over the course of the four-day trial. They weighed the witnesses' credibility. And then they found Mr. Giedgowd's age a determinative factor in Cafaro's firing. Cafaro's focus on three discreet pieces of evidence to argue no reasonable jury could have found but-for causation does not carry the day. Based on all the evidence presented, a reasonable jury could have found – and did find – age a determinative factor in Mr. Giedgowd's firing. We will

not disturb the jury's verdict unless "the record is critically deficient of the minimum quantum of evidence to sustain the verdict."[146] This is not the case here.

        **c.**      **We did not err in denying Cafaro's Rule 50(a) motion at trial.**

In arguing the jury's verdict cannot stand because the jury could not have relied on Cafaro's failure to inform Mr. Giedgowd of his performance issues, Cafaro also argues we erred in denying its Rule 50(a) motion at trial because our ruling on the record disregarded binding precedent from our Court of Appeals.[147] Cafaro asserts we cited a single reason for denying Cafaro's Rule 50(a) motion – issues of fact existed because Cafaro failed to inform Mr. Giedgowd of his performance issues.[148] Cafaro again moved for judgment as a matter of law under Rule 50(a) at the close of its case.[149] Cafaro argued our Court of Appeals in *Robinson v. Matthew Intern Corp.* held failing to provide performance reviews or provide the employee with information regarding performance issues is not evidence of pretext.[150] In response to Cafaro's second Rule 50(a) motion, we clarified our earlier holding:

> I think what the issue is – and I appreciate counsel raising the concern to the extent there was an impression that I was saying that the failure to give a performance review alone, I agree with you, in and of itself is not pretext. However, it goes to evidence of a variety of things.
>
> And there is confusion in the record – I won't say confusion – there's different statements in the record the jury has to discern. And given the – given the standard of Rule 50, I could see it's possible a jury could reach a verdict that performance was not in fact part of the equation, that it was done for restructuring reasons or otherwise, including age.
>
> And the evidence goes both ways on that. And I don't believe the evidence is clear enough to take the matter away from the jury, because there is sufficient evidence for which a jury could find in favor of the defendant – excuse me, in favor of the plaintiff—as to whether age was a determinate factor, given the standard by the Third Circuit.[151]

We previously detailed the evidence the jury heard. Mr. Giedgowd presented sufficient evidence to create a fact question to be determined by the jury at the close of its case when Cafaro moved the first time for judgment as a matter of law. The same is true for its second motion for judgment as a matter of law, and the present motion.

We deny Cafaro's Rule 50(b) motion for judgment as a matter of law.

### 2.   A reasonable jury could find Mr. Giedgowd entitled to front pay and back pay.

Cafaro argues a reasonable jury could not find Mr. Giedgowd entitled to front pay and back pay because Mr. Giedgowd willfully removed himself from the labor market by obtaining a commissioned-based job as an independent contractor working twenty-five hours per week and not looking for any other employment.[152] Cafaro also argues Mr. Giedgowd may not recover front pay because he let his license expire and thus cannot obtain substantially similar employment now.[153]

As Judge Beetlestone recently observed, "[w]hether a plaintiff has met the duty to mitigate damages is a question of fact, and therefore properly reserved for the jury where there is a genuine dispute of material over plaintiff's mitigation efforts."[154] To prove failure to mitigate, Cafaro must show "(1) substantially equivalent work was available, and (2) [Mr. Giedgowd] did not exercise reasonable diligence to obtain the employment."[155] Following our Court of Appeals' decision in *Caufield v. Center Area Sch. Dist.,* our colleagues have held an employer may also establish failure to mitigate by establishing the plaintiff "has withdrawn entirely from the employment market."[156] If relying on the theory the plaintiff withdrew from the employment market, the employer need not prove substantially equivalent work available.[157] As Judge Beetlestone cautioned: "Importantly, showing a plaintiff has withdrawn from the labor market ought not be conflated with defendant's burden to prove *both* that there are substantially

equivalent positions available, and that the plaintiff failed to exercise reasonable diligence in attempting to secure such a position. The required showing is that plaintiff has withdrawn *entirely* from the employment market, which is more onerous than establishing a plaintiff's job search was not reasonably diligent."[158] Judge Beetlestone continued, "[a] defendant is only exempted from demonstrating the availability of substantially equivalent work by meeting this heightened burden."[159] We are persuaded by Judge Beetlestone's thoughtful analysis.

Cafaro premises its argument here on Mr. Giedgowd removing himself from the labor market. Cafaro argues he removed himself from the labor market because he failed to look for any other jobs after he accepted a position as an independent contractor working twenty-five hours per week with Voluntary Benefits at Work. It relies on Judge Vanaskie's opinion in *Holocheck v. Luzerne Cty. Head Start, Inc.* to support its argument. In *Holocheck*, a former teacher's aide sued her former employer for, among other things, violating the ADEA and PHRA.[160] Her employer argued she failed to mitigate her damages because she removed herself from the labor market.[161] Judge Vanaskie found the plaintiff willfully removed herself from the labor market.[162] He reasoned the plaintiff "made no effort to obtain substitute employment-either within or outside the field of teaching-since she was terminated . . . [s]he has not read through the classified ads to locate a job, nor has she made any inquiries in her field . . . [she]. . . remained idle."[163] But she did have "sporadic[]" employment at a restaurant "over a two to three month period," but even with this position, the plaintiff "did nothing proactive to obtain the position . . . [and] [i]t is significant, moreover, that before, during, and after her brief stint at [the restaurant], [she] made no attempt to secure substitute employment."[164] While Cafaro tries to analogize *Holocheck* to our facts, we address material differences and we are more persuaded by Judge Kelly's opinion in *Briggs v. Temple University*.

In *Briggs,* Ruth Briggs sued Temple University for, among other things, violating the ADEA and PHRA.[165] Ms. Briggs worked as the executive assistant to various deans.[166] The parties tried the case before a jury, and the jury found in favor of Ms. Briggs on her age discrimination claim.[167] Temple moved for judgment as a matter of law arguing Ms. Briggs failed to mitigate her damages "by not seeking employment after accepting a job as a home healthcare aide in August 2016, thus ending any additional award for back pay and outright precluding an award for front pay."[168] Temple essentially argued Ms. Briggs "voluntarily withdrew from [the] employment market."[169]

Ms. Briggs searched for employment for twenty-eight months following her termination from Temple.[170] She accepted a job in August 2016 as a home healthcare aide.[171] Ms. Briggs argued the law imposed "no duty to continue searching for employment after accepting the home healthcare aid position in August 2016" relying on our Court of Appeals's *Tubari* reasoning of "a discriminatee who accepts suitable interim employment, even at a lower wage, has no continuing duty to search for a more lucrative job."[172] Temple argued Ms. Briggs "still had a duty to search for a substantially equivalent position because she 'did not secure her home healthcare job as 'interim employment,'' but rather 'she took the job as permanent employment.'"[173] Temple conceded "had Ms. Briggs taken the home healthcare aid job as *temporary or 'interim'* employment while continuing to search for *suitable, more permanent* employment, then the argument that she was not required to search for more lucrative interim work would be more appropriate."[174]

Judge Kelly found "the term 'interim' is more generally used to describe employment between the date of an employee's unlawful termination and the date of reinstatement or judgment in the employee's favor."[175] He continued, "[i]t is widely understood that, in order to

adequately mitigate damages, an employee may need to lower her sights following a reasonable period of unsuccessfully searching for equivalent employment" and "[t]ypically, courts must balance the 'tension between a discriminatee's duty to seek substantially equivalent interim employment and the subsequent duty to lower his or her sights after a 'reasonable' period of time.'"[176]

Judge Kelly dismissed Temple's argument finding its "proffered interpretation of the caselaw would transport a plaintiff's 'duty to mitigate' into a 'duty to absolve.'"[177] He concluded Ms. Briggs "has not withdrawn [from the employment market] at all," rather "she continually mitigated her damages as a home healthcare aide."[178]

While the facts here are different than those presented in *Briggs*, they are more like *Briggs* than those reviewed by Judge Vanaskie in *Holocheck*. Mr. Giedgowd remained unemployed for a period of "two to three months" after Cafaro fired him.[179] He then obtained a job as a commission-based, independent contractor for Voluntary Benefits at Work and works twenty-five hours a week. He no longer works as a retirement plan advisor; rather, he sells long-term care insurance to independent schools. Mr. Giedgowd made less money than he did at Cafaro. Mr. Giedgowd explained COVID impacted his ability to earn money in this job.[180] After obtaining this employment, Mr. Giedgowd did not look for other employment. He still coaches basketball and maintains his independent tax practice.

Whether Mr. Giedgowd mitigated his damages is a jury question. The jury heard the evidence, and they awarded Mr. Giedgowd front pay and back pay. We may only grant a Rule 50(b) motion "if the record is critically deficient of the minimum quantum of evidence to sustain the verdict." The jury had more than a "scintilla of evidence" to sustain its award. Unlike the plaintiff in *Holocheck*, Mr. Giedgowd sought employment following his termination from

Cafaro. He did not merely work an intermittent job at a restaurant to "help out." But he did take a job in a new field, like the former dean's assistant in *Briggs*. He works twenty-five hours a week as an independent contractor and is paid commission for sales.[181] He explained why his sales have been low since obtaining the employment as well as the upside potential of his role. The jury determined Mr. Giedgowd adequately mitigated his damages. We will not disturb the jury's verdict based on our view of his mitigation efforts given the ample evidence.

Although not possibly realizing the irony of its argument, Cafaro argues Mr. Giedgowd is not entitled to front pay because his license expired.[182] Cafaro also argued during the trial Ms. Conner – an unlicensed retirement plan advisor – could fulfill this role because Ms. Conner only needed a license for a small portion of her job duties. Cafaro cites no case law supporting its argument. We also did not find any upon review.

We will not disturb the jury's verdict having considered and weighed all the evidence.

### 3.    The jury reasonably awarded Mr. Giedgowd $180,000 in compensatory damages.

Cafaro argues no reasonable jury could have concluded Mr. Giedgowd entitled to $180,000 in compensatory damages, and we should remit the jury's award to zero. Cafaro relies on our Court of Appeals's decision in *Spence v. Board of Education* and two district court decisions in *Rush v. Scott Specialty Gases* and *Valentin v. Crozier-Chester Medical Center*.[183] Cafaro argues Mr. Giedgowd's testimony is insufficient to support this award. Mr. Giedgowd relies on our decision in *Middlebrooks v. Teva Pharm. USA, Inc.* to argue Mr. Giedgowd presented sufficient evidence to support an award of compensatory damages.[184] We agree with Mr. Giedgowd and decline to disturb the jury's verdict.

Mr. Giedgowd is entitled to compensatory damages upon a showing of actual injury.[185] "When the only evidence of emotional distress is the plaintiff's own testimony about depression

and humiliation, 'and there is no evidence of physical suffering, the need for professional care, or the like, then there is no 'reasonable probability, rather than a mere possibility, that damages due to emotional distress were in fact incurred as a result of the 'wrongful act.'"[186] Medical evidence or corroborating testimony is not required to support an award for mental anguish damages, and "courts have held that intangible injuries such as sleeplessness, headaches, and feelings of humiliation and embarrassment are sufficient to support an award of compensatory damages."[187] While our Court of Appeals has not ruled on whether a plaintiff's testimony is sufficient to support an award of emotional distress damages, district courts in our circuit have found a plaintiff's testimony sufficient to uphold compensatory damages awards.[188]

Mr. Giedgowd described his termination as "devastating."[189] He testified, following his termination, he went home to his wife and "was visibly shaken," "felt embarrassed [because] I have to tell my kids, friends of mine. I had relationships with clients for like, over 20 years, and – doing good advisory work, and now I have to explain to them that I got, you know, let go. Don't even know why I got let go."[190] He felt "[his] name is getting dragged in the mud" because of the post-lawsuit criticisms in his performance, "but none of that was ever brought up to [him] before [he] got terminated and it still sticks with [him] today."[191] Mr. Giedgowd also explained he "live[s] five minutes from [his old] office . . . and, you know, when [he] go[es] to Wegmans, which is right by [his] old office . . . [he] see[s] this, and it bothers [him] . . . two years after."[192] Mr. Giedgowd also "worr[ies] about providing for [himself] financially."[193] He testified he does "not sleep at night very good."[194]

This testimony is sufficient for the jury's award. The jury heard Mr. Giedgowd's testimony both on direct and on cross-examination. The jury weighed the evidence and found

Mr. Giedgowd credible. An award of $180,000 does not shock the judicial conscience nor is it "clearly unsupported and/or excessive."[195]

We deny Cafaro's motion for judgment as a matter of law as to compensatory damages.

### B.   We deny Cafaro's motion for a new trial.

Cafaro also moves for a new trial on two grounds: (1) our decision to exclude an email as hearsay and irrelevant constitutes substantial error; and (2) the verdict is against the weight of the evidence because Mr. Giedgowd did not establish but-for causation.[196]

We "may, on motion, grant a new trial on all or some of the issues – and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action in federal court."[197] Rule 59 does not provide specific grounds to grant a new trial, leaving the decision to our discretion.[198] Motions for new trial may be granted where there is "substantial error in the admission or exclusion of evidence; error in the court's instructions to the jury; where the jury's verdict [is] inadequate or excessive; or where the verdict [is] against the weight of the evidence."[199] Our Court of Appeals cautions we should grant a motion for new trial "only when 'the great weight of the evidence cuts against the verdict and . . . [ ] a miscarriage of justice would result if the verdict were to stand.'" [200] "A district court's power to grant a new trial is limited to ensure that it does not substitute its judgment of the facts and the credibility of the witnesses for that of the jury."[201]

### 1.   We did not err in excluding the email based on hearsay.

Cafaro argues we "erroneously rejected" the proffered email because: (1) Cafaro offered it to show motivation, not for truth of the matter asserted; (2) it falls within the hearsay exception for a business record; and (3) we erroneously found the email irrelevant. Mr. Giedgowd responds we correctly found the email inadmissible, and even if it is admissible, our error is nothing more

than harmless error and does not warrant a new trial. We conclude the email is inadmissible as hearsay and clarify the facts surrounding Cafaro's proffer of this email at the eleventh hour. Even if reasonable minds could dispute our evidentiary ruling, it constitutes harmless error and does not warrant a new trial.

On the eve of trial, Cafaro's attorney added an exhibit described by Cafaro as a "client complaint" about Mr. Giedgowd.[202] The proposed exhibit involves a chain of emails: an email from Ms. Carroll to client, Tom Mitchell; a response from Mr. Mitchell to Ms. Carroll; and Ms. Carroll's forwarding of the email chain to Ms. Greenleaf, Mr. Giedgowd, Mr. Ries, Mr. Hartsig, and Mr. Clark.[203] We asked Cafaro's counsel: "How does Mr. Mitchell's communication to Marcie Carroll as a nondecision maker come in?"[204] She responded: "Your Honor, it comes in not for the truth of the matter asserted but because it was part of the information that was used when the decision makers were all cc'd or most of whom are cc'd on this email reviewed it and took it or assumed it to be a criticism of Mr. Giedgowd's performance. So it factored into the decision . . . ."[205] Mr. Giedgowd's attorney objected because the exhibit contained "two levels of hearsay . . . [t]he first layer of hearsay comes from Tom Mitchell to Marcie Carroll, and we object to that. We agree that that should not be admissible."[206]

After considering extensive argument from both sides on the admissibility of the belatedly produced email from Mr. Mitchell to Ms. Carroll, we ruled the email "is classic hearsay. It is a statement by a witness—unless, unless he testifies to it in his deposition, but even then, it's not relevant because he's not writing it to a decision maker, nor is there any individual in the email that Ms. Carroll is saying I'm going to share this with the decision makers. So decide as you wish, but the ruling is that the email of February 8, 2019, at 3:15 p.m. is out."[207]

Cafaro's counsel asked us to clarify. We then discussed both hearsay and relevance again and concluded: "[I]t's out. It's hearsay . . . the email itself . . . is classic hearsay, and it's out."[208]

Cafaro argues first the email from Mr. Mitchell to Ms. Carroll is not hearsay because it offered the email as evidence of Cafaro's motivation for firing Mr. Giedgowd, not for the truth of the matter asserted. In doing so, Cafaro relies upon our Court of Appeals's decision in *Fahnestock v. Carlisle Reg'l Med. Ctr.*[209] as well as an opinion from Judge Kugler in District of New Jersey. Fatal to Cafaro's argument is Ms. Carroll is not a decision maker; thus, Cafaro fails to show how the email from Mr. Mitchell to Ms. Carroll can be offered to prove motivation for firing when Ms. Carroll admittedly had nothing to do with the decision to fire Mr. Giedgowd.

In *Fahnestock*, our Court of Appeals upheld Judge Jones's grant of summary judgment in favor of the employer.[210] Ms. Fahnestock appealed for various reasons, one of which included the court considering improper hearsay evidence in granting summary judgment.[211] Ms. Fahnestock argued "the disciplinary citations produced by [the employer] constitute improper hearsay evidence because they referenced unidentified physicians and it was undisclosed when or how the complaints were made."[212] Our Court of Appeals found "[t]he citations in this case do not constitute hearsay because they were not offered as evidence to prove the truth of the matters asserted. The documents were being offered to explain [the employer's] motivation for terminating Fahnestock's employment, not to assert the truth of the statements therein."[213]

In *Raghbat*, relied upon by Cafaro in support of its argument, the plaintiff objected to evidence of third-party complaints to the plaintiff's supervisor as hearsay.[214] Judge Kugler found "these statements are not being offered to prove the truth of their contents . . . [r]ather, this evidence is being offered to prove the effect of the state of mind of Cooper Health employees, namely Plaintiff's supervisor, Hummel."[215] Judge Kugler found these statements were not

hearsay for "purposes of determining whether [the plaintiff] was fired for discriminatory reasons."[216]

Like Judge Kugler in *Raghbat*, we stated on the record "if Ms. Greenleaf spoke to Mr. Mitchell, that would come in. She's the decision maker."[217] Our colleagues have found the same when complaints are made to the decision maker.[218] This is not the case here. Mr. Mitchell sent an email to Ms. Carroll, who then forwarded the email to various Cafaro employees, including some decision makers. This is classic double hearsay. Ms. Carroll is not a decision maker and forwarding Mr. Mitchell's email to decision makers does not get Cafaro out of the hearsay exclusion for Mr. Mitchell's email to Ms. Carroll. We properly excluded the email from Mr. Mitchell to Ms. Carroll as hearsay.

Cafaro next argues the belatedly produced email is admissible because it is a business record. Rule 806 provides: "The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: (6) Records of a Regularly Conducted Activity. A record of an act, event, condition, opinion, or diagnosis if: (A) the record was made at or near the time by – or from information transmitted by—someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."[219] Mr. Giedgowd counters the email from Mr. Mitchell to Ms. Carroll is not a

business record because Cafaro fails to show Mr. Mitchell acted in the ordinary course of business, the emails were regular and routine, or any of the other elements of Rule 803(6).

We asked Cafaro how the email from Mr. Mitchell to Ms. Carroll came in as evidence. Cafaro answered it came in because it did not offer the email for the truth of the matter asserted. Mr. Giedgowd objected to the proposed exhibits as double hearsay. Cafaro mentioned nothing about the email constituting a business record in response to our inquiry nor Mr. Giedgowd's objection. Cafaro's present argument is the first time it raised this issue. Cafaro waived this argument as we could not have made substantial error based on exclusion of this evidence having never heard the argument Cafaro now presents.[220]

Even if Cafaro did not waive its argument regarding the hearsay exception, Cafaro has not met the elements of the business record exception because it offered *nothing* in the record to satisfy the elements. It instead now argues it "could" have. What it could now offer is of no moment to us in deciding a motion under Rule 59.  It did not meet its burden when asked at trial after belatedly producing the document on the eve of trial.

Cafaro next argues we erroneously excluded the exhibit based on relevance. To be clear, we ruled "the email is out on hearsay. The testimony as to what he [(Mr. Mitchell)] told Marcie Carroll, other than there's some proof that he was speaking to people other than Marcie Carroll at the same time is out on relevance."[221] We excluded Mr. Mitchell's deposition testimony about what he told Ms. Carroll based on relevance because Ms. Carroll is not a decision maker.[222]

Even if we erred in excluding this email, our error is harmless.[223] An error is harmless if it is highly probable the error did not affect the judgment.[224] Cafaro argues the error is not harmless because Mr. Giedgowd's counsel questioned witnesses about client complaints and reminded the jury about this in closing. Mr. Giedgowd counters if the email should have been

admitted, it is harmless error because Mr. Mitchell praised Mr. Giedgowd's performance at his deposition, which Mr. Giedgowd would have presented had the email came in, and the jury heard other evidence of Mr. Giedgowd's purported performance issues.

The jury heard evidence of Mr. Giedgowd's purported performance issues, including evidence from Ms. Greenleaf about two client meetings where Mr. Giedgowd did not perform adequately according to Ms. Greenleaf. The jury also heard one of Cafaro's decision makers, Mr. Clark, testify Mr. Giedgowd did not get terminated because of performance issues. Cafaro had an opportunity to re-direct its witnesses after opposing counsel questioned them on client complaints. It is not highly probable another example of Mr. Giedgowd's purported poor performance would have affected the jury's verdict in this case.

We deny Cafaro's motion for a new trial based on our exclusion of evidence.

### 2.    The verdict is not against the weight of the evidence.

Cafaro argues we should grant its motion for a new trial because "Mr. Giedgowd failed to offer sufficient evidence to sustain his claim of age discrimination."[225] Cafaro offers the same arguments it did in its motion for judgment as a matter of law regarding failure to prove but-for causation.[226] Mr. Giedgowd counters the verdict is not against the weight of the evidence because he adduced sufficient evidence to sustain a verdict in his favor.[227]

We detailed the facts adduced at trial at length in our discussion of Cafaro's motion for judgment as a matter of law. Cafaro offers no new arguments here, except the standard for a new trial is "substantially less demanding than that for judgment as a matter of law."[228] Even under the less demanding standard, the jury's verdict is supported by the evidence adduced at trial. There is no miscarriage of justice by allowing the jury's well-reasoned verdict to stand.

We deny Cafaro's motion for a new trial based on the weight of the evidence.

### C.   We decline to deny the motion for a new trial conditioned on Mr. Giedgowd accepting a remittitur.

Cafaro lastly argues if we deny the motion for a new trial, it should be on the condition Mr. Giedgowd accepts a remittitur. "Remittitur is the well-established device employed when the trial judge finds that a decision of a jury is clearly unsupported and/or excessive."[229] "A remittitur is a substitution of the court's judgment for the jury regarding the appropriate award of damages. The court orders a remittitur when it believes the jury's award is *unreasonable* on the facts."[230]

The jury's verdict is not unreasonable in light of the facts. We deny Cafaro's motion for denial of a new trial on the condition of remittitur.

### D.   We award prejudgment interest on the back pay award.

Mr. Giedgowd moves to mold the judgment to include prejudgment interest on the jury's back pay award.[231] He requests we apply the Internal Revenue Service overpayment rate under 28 U.S.C. § 6621(a)(1) and award him $6,100 in prejudgment interest from April 1, 2019 to July 29, 2021.[232] Cafaro does not oppose the motion.

In employment cases, we may award prejudgment interest in our discretion if it "helps to make victims of discrimination whole," serving to "compensate a plaintiff for the loss of the use of money that the plaintiff otherwise would have earned had he not been unjustly discharged."[233] There is a "strong presumption in favor of awarding prejudgment interest, except where the award would result in 'unusual inequities.'"[234] The prejudgment interest rate applied to an award of back pay is within our discretion.[235]

We grant Mr. Giedgowd's unopposed motion and will apply the IRS overpayment rate in 26 U.S.C. § 6621 to restore him to his position if not for Cafaro's discrimination.[236]

## III.    Conclusion

Our jury returned a verdict based on ample evidence Cafaro fired Mr. Giedgowd with his age as a determinative reason. The jury's verdict as to damages is based on adduced evidence. Cafaro disagrees.  But the jury heard both sides and presumably believed Mr. Giedgowd rather than Cafaro's multiple witnesses who presently often conflicting stories.

We deny Cafaro's motion for judgment as a matter of law, for a new trial, or for denial of a new trial based on remittitur. We grant Mr. Giedgowd's unopposed motion to mold the judgment to include prejudgment interest on his back pay award.

---

[1] Notes of Testimony ("N.T."), July 26, 2021, at 54:7–9.

[2] *Id.* at 54:13–17, 55:18–24.

[3] *Id.* at 57:12–21, 115:1–8.

[4] *Id.* at 149:20–150:12.

[5] *Id.* at 55:9–56:1.

[6] *Id.* at 56:2–8.

[7] *Id.* at 57:9–11; 138:2–25.

[8] *Id.* at 58:7–11.

[9] *Id.* at 59:4–11.

[10] *Id.* at 59:12–60:14.

[11] *Id.*

[12] *Id.* at 61:15–62:22.

[13] *Id.* at 63:24–64:1.

[14] *Id.* at 66:2–11.

[15] *Id.* at 66:16–68:7. Mr. Ries did not have a tax certification. *Id.* at 68:9–14.

[16] *Id.* at 56:9–15, 61:11–14.

[17] *Id.* at 65:9–18; *see also* N.T., July 28, 2021, at 34:6–13.

[18] N.T., July 26, 2021, at 60:15–61:2.

[19] *Id.* at 60:23–61:10.

[20] *Id.* at 58:12–20, 62:23–63:7, 126:6–23; *see also* N.T., July 28, 2021, at 21:23–22:1, 22:16–25.

[21] N.T., July 26, 2021, at 63:3–5.

[22] *Id.* at 63:6–7.

[23] *Id.* at 63:8–14; N.T., July 28, 2021, at 22:16–25

[24] N.T., July 26, 2021, at 63:15–18.

[25] *Id.* at 68:15–70:12; 93:19–94:1.

[26] *Id.* at 70:10–12.

[27] *Id.* at 58:21–25.

[28] *Id.* at 59:1–3, 14–16.

[29] *Id.* at 84:3–5.

[30] *Id.* at 71:7–15.

[31] N.T., July 27, 2021, at 52:13–16, 215:14–22.

[32] N.T., July 26, 2021, at 144:12–146:21.

[33] N.T., July 27, 2021, at 136:4–137:17.

[34] Trial Ex. 41 (organization chart indicating positions); N.T., July 27, 2021, at 65:22–66:4 (indicating Cafaro placed Ms. Conner into the retirement plan advisor role in January 2019); N.T., July 26, 2021, at 59:17–18 (Mr. Ries age forty-four at time of acquisition); N.T., July 27, 2021, at 34:17–23) (Ms. Conner age forty-nine at time of Mr. Giedgowd's termination).

[35] N.T., July 27, 2021, at 67:13–14, 68:5–9.

[36] *Id.*, at 99:3–14, 100:2–6.

[37] *Id.* at 105:8–107:25, 204:21–205:4.

---

[38] *Id.* at 106:10–108:10.

[39] *Id.* at 115:18–116:4; *see also* Trial Ex. 43 (job description).

[40] Trial Ex. 43; *see also* N.T., July 26, 2021, at 74:17–75:23.

[41] N.T., July 27, 2021, at 33:20–34:3, 117:21–118:6, 189:15–22.

[42] *Id.* at 131:4–20.

[43] *Id.* at 107:18–108:10.

[44] *Id.* at 38:18–21, 119:1–3.

[45] *Id.* at 38:22–24; 41:1–11.

[46] *Id.* at 119:24–120:17, 121:8–16.

[47] *Id.* at 35:19–36:5 (age twenty-eight at time of Mr. Giedgowd's termination), 120:18–25.

[48] *Id.* at 121:4–7.

[49] *Id.* at 126:9–22.

[50] *Id.* at 126:6–127:19.

[51] *Id.* at 117:19–118:25.

[52] *Id*. at 242:13–243:14.

[53] *Id.* at 33:9–34:3.

[54] *Id.* at 127:20–129:13.

[55] *Id.* at 128:21–129:13.

[56] *Id.* at 129:14–23.

[57] *Id.* at 34:24–35:18; N.T., July 28, 2021, at 25:25–26:8, 35:7–20, 35:24–36:4, 36:10–18.

[58] *Id.* at 121:17–20.

[59] *Id.* at 121:21–25.

[60] *Id.* at 122:1–14. Mr. Giedgowd testified these roles comprised a very small part of his job at Carroll Consulting. N.T., July 26, 2021, at 138:5–139:25.

[61] N.T., July 27, 2021, at 123:3–7.

[62] *Id.* at 123:8–25.

[63] *Id.* at 123:12–124:25.

[64] *Id.* at 125:1–126:5, 133:6–13.

[65] *Id.* at 129:24–132:8, 132:22.

[66] *Id.* at 131:2–4.

[67] *Id* at 132:14–21.

[68] N.T., July 26, 2021, at 65:9–14; N.T. 07/28/2021 at 33:8–34:5.

[69] N.T., July 27, 2021, at 41:1–4, 179:2–5, 206:14–19.

[70] *Id.* at 81:15–82:5.

[71] *Id.* at 184:7–24; N.T., July 26, 2021, at 77:15–20, 78:18–24, 89:6–25. The jury also heard Ms. Carroll's deposition testimony describing Mr. Giedgowd as more qualified than Ms. Conner, acknowledged she paid him the most out of any retirement plan advisor at Carroll Consultants, and testified he had the most experience and had more positive relationships with his clients than Mr. Ries. N.T., July 28, 2021, at 40:7–42:17. She also described his dual certification with tax as "helpful" experience. *Id.* at 46:24–47:5. She described him as "dedicated, loyal, and a good employee and knowledgeable." *Id.* at 54:5–10. Ms. Carroll paid Mr. Giedgowd $100,000 "the day that he was leaving the office" based on a previous "verbal discussion" before his termination and because she "valued Tom. [She] liked Tom and [she] valued him as an employee - as a long-term employee with the company, very loyal." *Id.* at 30:17–31:6. She discussed the payment with Mr. Giedgowd and "basically said that [she] was going to give him that – you know, $100,000 for all of his hard work and efforts and his loyalty." *Id.* at 31:3–6.

[72] N.T., July 27, 2021, at 183:15–22.

[73] N.T., July 26, 2021, at 78:25–79:11.

[74] *Id.* at 70:15–18.

[75] N.T., July 27, 2021, at 138:13–22.

[76] N.T., July 26, 2021, at 79:12–20.

[77] N.T., July 27, 2021, at 178:2–9.

[78] *Id.* at 237:5–9.

[79] *Id.* at 234:1–7.

[80] *Id.* at 234:20–23.

[81] *Id.* at 236:2–9.

[82] *Id.* at 236:2–14.

[83] *Id.* at 179:10–18, 240:11–13; N.T., July 26, 2021, at 83:12–15.

[84] N.T., July 27, 2021, at 214:12–16, 239:15–21, 244:19–21.

Mr. Greenleaf testified:

> Q: Can you understand how when the oldest employee of the company is called into a meeting and asked to tell his clients he's retiring, that a reasonable person could understand that age is on the mind of that decision maker?
> A: Yes.

[85] *Id.* at 180:17–181:18, 241:2–21.

[86] N.T., July 26, 2021, at 79:21–80:4, 80:13–15, 81:5–8.

[87] *Id.* at 81:21–82:5.

[88] *Id.* at 82:10–17.

[89] *Id.* at 81:5–8.

[90] *Id.*

[91] N.T., July 27, 2021, at 242:1–12.

[92] N.T., July 26, 2021, at 81:11–14. Mr. Giedgowd testified Mr. Hartsig called Wayne Greenleaf, but Mr. Clark and Mr. Hartsig testified Mr. Hartsig called Mr. Clark. *See id.*, N.T., July 27, 2021, at 141:1–4; 240:17–241:25.

[93] N.T., July 27, 2021, at 143:8–15.

[94] *Id.* at 143:21–22.

[95] *Id.* at 145:5–14.

[96] *Id.*

[97] *Id.*

[98] N.T., July 26, 2021, at 91:23–92:4.

[99] *Id.* at 92:8–25.

[100] *Id.* at 92:24–25.

[101] *Id.* at 93:1–3.

[102] N.T., July 27, 2021, at 7:2–5.

[103] N.T., July 26, 2021, at 93:4–23.

[104] *Id.* at 95:5–17.

[105] *Id.* at 91:18–20, 92:12–14.

[106] *Id.* at 94:11–24.

[107] *Id.* at 97:6–9.

[108] N.T., July 27, 2021, at 9:15–23.

[109] *Id.* at 10:18–15:6.

[110] *Id.* at 17:11–14.

[111] *Id.* at 18:1–3.

[112] N.T., July 26, 2021, at 82:18–21.

[113] *Id.* at 91:8–11.

[114] *Id.* at 106:3–107:8.

[115] *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).

[116] *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009).

[117] *Lightning Lube, Inc.*, 4 F.3d at 1166.

[118] *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 433 (3d Cir. 2009) (citation omitted).

[119] *Id.* (quoting *Marra v. Phila. Housing Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)).

[120] ECF Doc. No. 78-1 at 9–11 (relying on *Heverling v. McNeil Consumer Pharms.*, No. 16-600, 2017 WL 714047 (M.D. Pa. Feb. 23, 2017 and *Burton v. Pa. State Police*, 990 F. Supp. 2d 478 (M.D. Pa. 2014), *aff'd*, 612 F. App'x 124 (3d Cir. 2015)).

[121] *Heverling*, 2017 WL 714047, at *1, 4 (emphasis in original).

[122] *Burton*, 990 F. Supp. 2d at 497–98.

[123] *Id.* at 510–11, n. 12.

[124] *Id.* at 510–11.

[125] *Id.* at 511.

[126] N.T., July 26, 2021, at 161:12–15.

[127] *Robinson v. City of Phila.*, 491 F. App'x 295, 299 (3d Cir. 2012).

[128] *Hooker v. Novo Nordisk Inc.*, No. 20-1427, 2021 WL 3087786, at *4 (3d Cir. July 22, 2021) (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)) (publication in the Federal Appendix forthcoming).

[129] ECF Doc. No. 78-1 at 11–16.

[130] N.T., July 27, 2021, at 41:1–4, 179:2–5, 206:14–19.

[131] Trial Ex. 43; N.T., July 26, 2021, at 77:5–11; N.T., 07/27/2021, at 33:20–34:3, 115:18–116:4, 117:19–118:6, 189:15–22.

[132] N.T., July 27, 2021, at 117:19–118:25, 242:13–243:14.

[133] *Id.* at 34:24–35:18; N.T., July 28, 2021, at 25:25–26:8, 35:7–20, 35:24–36:4, 36:10–18.

[134] N.T., July 27, 2021, at 33:9–34:4, 126:9–127:19, 127:20–129:13.

[135] *Id.* at 36:21–37:1, 81:15–82:5, 121:17–122:14, 123:3–126:5, 129:24–132:22, 133:6–13; N.T., July 28, 2021, at 33:8–34:5, 40:7–42:17, 46:24–47:5, 54:5–10.

[136] N.T., July 26, 2021, at 54:7–9, 55:9–56:15, 57:9–21, 58:7–11, 59:1–3, 59:14–16, 61:11–62:22, 65:9–18, 66:2–11, 66:16–68:7, 115:1–8, 138:2–25, 149:20–25; N.T., July 28, 2021, at 34:6–13.

[137] N.T., July 27, 2021, at 105:8–107:25, 204:21–205:4.

[138] *Id.* at 183:15–22.

[139] *Id.* at 102:3–5, 184:7–24.

[140] N.T., July 26, 2021, at 77:15–20, 78:18–24, 89:6–25.

[141] N.T., July 27, 2021, at 180:17–181:18, 241:2–21.

[142] *Id.* at 178:2–9, 237:5–9.

[143] *Id.* at 214:12–16, 234:1–7, 234:20–23, 236:2–14, 239:15–21, 244:19–21.

[144] N.T., July 26, 2021, at 79:21–80:4, 80:13–15, 81:5–8; N.T., July 27, 2021, at 242:1–12.

[145] N.T., July 26, 2021, at 84:3–5.

[146] *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009).

[147] ECF Doc. No. 78-1 at 14.

[148] *Id.* Cafaro relies on the following reasoning provided by the Court:

> For purposes of today, in terms of this action, there is just – the one fact that jumps out from the plaintiff's side that mandates and militates in favor of denial – and I am denying the Rule 50 motion – is that you say there's no basis to show it, there's no – the performance was – it was horrendous, but Ms. Greenleaf did not use that word – but the performance was embarrassing, that may very well be true. What raises severe serious questions for a jury, based on the Rule 50 standard I must apply today, is that none of this was told at all or shared with the plaintiff. And so there's a question as to whether there is an other (*sic*) purpose here.

N.T., July 27, 2021, at 172:15–173:1.

[149] N.T., July 28, 2021, at 98:3–24.

[150] *Id.*

[151] *Id.* at 99:10–100:3.

[152] ECF Doc. No. 78-1 at 16–19.

[153] *Id.*

[154] *Ngai v. Urban Outfitters,* No. 19-1480, 2021 WL 1175155, *20 (E.D. Pa. Mar. 29, 2021).

[155] *Booker v. Taylor Milk Co.*, 64 F.3d 860, 864 (3d Cir. 1995).

[156] *Ngai*, 2021 WL 1175155, at *20 (citing *Briggs v. Temple Univ.*, 339 F. Supp. 3d 466, 507 (E.D. Pa. 2018); *see also Yingst v Texas New Mexico News Paper Partnership*, No. 12-1803, 2014 WL 3952611, *11 (W.D. Pa. Aug. 13, 2014); *McKenna v. City of Phila.*, Nos. 98-5835, 99-1163, 2010 WL 2891591, at *18 (E.D. Pa. July 20, 2010); *Holocheck v. Luzerne Cnty. Head Start, Inc.*, No. 04-2082, 2007 WL 954308, at *14–15 (M.D. Pa. Mar. 28, 2007).
In *Caufield*, our Court of Appeals cited its decision in *Tubari Ltd. Inc. v. NLRB*, approvingly in the context of an ADEA claim. *Caufield v. Center Area Sch. Dist.*, 133 F. App'x 4, 10–11 (3d Cir. 2005). It held the defendant's burden for damage mitigation as follows: "To prove a failure to mitigate, [defendant] had to prove either that other substantially equivalent positions were available to [plaintiff] and she failed to use reasonable diligence in attempting to secure those positions, or alternatively, that [plaintiff] withdrew entirely from the employment market." *Id.*

[157] *Ngai*, 2021 WL 1175155, at *20 (citing *Brigg*, 339 F. Supp. 3d at 507).

[158] *Id.* (emphasis in original).

[159] *Id.*

[160] *Holocheck*, 2007 WL 954308, at *1, 5.

[161] *Id.* at *14.

[162] *Id.* at *15.

[163] *Id.*

[164] *Id.*

[165] *Briggs*, 339 F. Supp. 3d at 477.

[166] *Id.* at 478.

[167] *Id.* at 477.

[168] *Id.* at 507.

[169] *Id.*

[170] *Id.* at 508.

[171] *Id.*

[172] *Id.*

[173] *Id.*

[174] *Id.* (emphasis in original).

[175] *Id.* at 509.

[176] *Id.* (further citations omitted).

[177] *Id.* at 510.

[178] *Id.* Judge Kelly further noted, "Temple does not argue that she was insufficiently diligent in obtaining her current employment, that her current employment is not substantially equivalent, or that she lowered her sights too quickly. Instead, Temple would rather the Court place the burden on Briggs that she must always be searching for a non-existent job that has not presented itself over twenty-eight months or that she may never be allowed to let go or move on with her life." *Id.*

[179] N.T., July 26, 2021, at 91:23–92:4.

[180] *Id.* at 95:4–17.

[181] Cafaro also seems to focus on Mr. Giedgowd's new employment being a subcontractor role as opposed to an employee. Cafaro provides no argument or caselaw supporting its focus on this distinction, and its argument regarding failure to mitigate. We will not make the argument for Cafaro.

[182] Cafaro also argues it "undercut[s] Mr. Giedgowd's argument for entitlement to back pay," but Cafaro failed to adduce the date of expiration at trial nor does Cafaro expand on this argument.

[183] ECF Doc. No. 78-1 at 19–21 (relying on *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986), *Rush v. Scott Specialty Gases, Inc.*, 930 F. Supp. 194 (E.D. Pa. 1996), *rev'd on other grounds*, 113 F.3d 476 (3d Cir. 1997), and *Valentin v. Crozier-Chester Med. Ctr.*, 986 F. Supp. 292 (E.D. Pa. 1997)).

[184] ECF Doc. No. 79 at 17–19 (relying on *Middlebrooks v. Teva Pharms. USA, Inc.*, No. 17-412, 2019 WL 438092 (E.D. Pa. Feb. 4, 2019)).

[185] *Gunby v. Pa. Elec. Co.*, 840 F.2d 1108, 1121 (3d Cir. 1988); *see also Briggs*, 339 F.Supp.3d at 518.

[186] *Briggs*, 339 F.Supp.3d at 518 (citing *Rush*, 930 F.Supp. at 199 (quoting *Spence*, 806 F.2d t 1201).

[187] *Id.* (further citation omitted).

[188] *Middlebrooks*, 2019 WL 438092, at *18; *see, e.g. Williams v. Care*, No. 14-6347, 2016 WL 4478810, at *5 (E.D. Pa. Aug. 25, 2016); *Holt v. Pennsylvania*, No. 10-5510, 2015 WL 4944032, at *28 (E.D. Pa. Aug. 19, 2015), *aff'd in part, rev'd in part on other grounds and remanded*, 683

F. App'x 151 (3d. Cir. 2017); *Jeckell v. Crestwood Area Sch. Dist.*, No. 04-1135, 2008 WL 4372797, at *6 (M.D. Pa. Sept. 18, 2008).

[189] N.T., July 26, 2021, at 90:3.

[190] *Id.* at 81:21–82:5.

[191] *Id.* at 82:10–17.

[192] *Id.* at 82:18–21.

[193] *Id.* at 91:8–11.

[194] *Id.* at 90:1–8.

[195] *See Cortez v. Trans Union LLC*, 617 F.3d 688, 715–16 (3d Cir. 2010) (further citations omitted); *Ward v. Wexford Health Sources, Inc.*, No. 14-6984, 2016 WL 7335350, at *4 (E.D. Pa. Jan. 5, 2016).

[196] ECF Doc. No. 78-1 at 22–28.

[197] Fed. R. Civ. P. 59(a)(1)(A).

[198] *Blancha v. Raymark Indus.*, 972 F.2d 507, 512 (3d Cir. 1992) ("The decision to grant or deny a new trial is confided almost entirely to the discretion of the district court") (citing *Allied Chem. Corp. v. Daiflon, Inc.* 449 U.S. 33, 36 (1980)).

[199] *Snider v. Sterling Airways, Inc.*, No. 13-2949, 2017 WL 3873540, at *2 (E.D. Pa. Sept. 5, 2017) (citations omitted).

[200] *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016) (quoting *Springer v. Henry*, 435 F.3d 268, 274 (3d Cir. 2006)).

[201] *Id.*

[202] N.T., July 26, 2021, at 10:24–11:2.

[203] ECF Doc. No. 78-6.

[204] N.T., July 26, 2021, at 11:23–4.

[205] *Id.* at 11:25–12:5.

[206] *Id.* at 13:9–14.

---

[207] *Id.* at 16:13–21.

[208] *Id.* at 18:4–10.

[209] 659 F. App'x 75 (3d Cir. 2016).

[210] *Id.* at 75.

[211] *Id.* at 78.

[212] *Id.*

[213] *Id.* (citing *Wolff v. Brown*, 128 F.3d 682, 685 (8th Cir. 1997)).

[214] *Raghbat v. Cooper Health System*, No. 16-2045, 2018 WL 2230541, at *6 (D.N.J. May 16, 2018).

[215] *Id.* (citing *Teubert v. SRA Int'l, Inc.*, 192 F.Supp.3d 569, 578 (D.N.J. 2016) and *Fahnestock*, 659 F. App'x at 78).

[216] *Id.*

[217] N.T., July 26, 2021, at 13:22–25.

[218] *See, e.g. Teubert*, 192 F.Supp.3d at 578–79 (discussing emails from plaintiff and his supervisors and finding "Defendant argues that evidence documenting the events leading up to Teubert's termination are offered not to prove the truth of the matter asserted . . . but to show SRA's representative's state of mind—how [the plaintiff's] superiors perceived his behavior and what documents they relied on when Hirsch, human resources, and [the employer's legal counsel] decided to terminate Plaintiff's employment."); *Mikulan v. Allegheny Cnty.*, No. 15-1007, 2017 WL 2374430, at *4 (W.D. Pa. May 31, 2017) (finding "the preceding hearsay analysis is different with respect to Warden Harper because he was the decisionmaker who decided to terminate [the plaintiff's] employment . . . If Warden Harper testifies at the trial that the rumors about [the plaintiff's] negative comments motivated his termination . . . it would still nevertheless be testimony offered to explain his motivation for terminating [the plaintiff,] and, therefore, would not be inadmissible hearsay); *Hite v. Peters*, No. 07-4992, 2010 WL 4674400, at *14 (D.N.J. June 30, 2010) ("The record further reveals that the reports 'from others' include the emails, noted above, which [the supervisor] received. These emails are either admissible as nonhearsay, offered to demonstrate [the supervisor's] mindset regarding the termination, or are likely admissible under the business records exception to the hearsay rule.").

[219] Fed. R. Evid. 803(6).

[220] *See, e.g. Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir. 1998) ("[I]t is clear a party who fails to object to errors at trial waives the right to complain about them following trial."); *see also*

*Kremer v. A Woman's Place*, No. 05-3606, 2007 WL 9725052, at *5–6 (rejecting objection based on unfair prejudice not raised at trial, only in post-trial motions).Here, Cafaro attempted to add an exhibit at the eleventh hour. We asked counsel how Cafaro planned to move the exhibit into evidence. Cafaro responded it did not proffer the evidence for the truth of the matter asserted. Mr. Giedgowd objected to the exhibit as double hearsay. Cafaro never responded the exhibit is a business record exception. Cafaro cannot now do so.

[221] N.T., July 26, 2021, at 19:15–19.

Cafaro points to our reasoning on the record when we stated "[T]he direct email is out. It is classic hearsay. It is a statement by a witness – unless, unless he testifies to it in his deposition, but even then, it's not relevant because he's not writing it to a decision maker, nor is there any indication in the email that Ms. Carroll is saying I'm going to share this with the decision makers." *Id.* at 16:12–19. We stated several times after this the reason we excluded the email as hearsay, and we excluded Mr. Mitchell's deposition testimony about the contents of the email to Ms. Carroll based on relevance because she is not a decision maker.

[222] The record, in relevant part, provides:

> Mr. Console: Your Honor, I'm sorry, just a further point of clarification, Mr. Mitchell then should not – he should not be testifying about the contents of that email to Marcie because Your Honor said that would be irrelevant; is that right?
>
> The Court: That's correct. The content – yes. The trick – the subtlety here is – and sometimes you asked the question that didn't quote from it, and counsel said let's quote the email. That quoting from the email is hearsay. Okay. Now, if – to draw the subtlety here, if Mitchell told Carroll something, that's out because it's relevant – it's not relevant, unless – unless he was on some kind of conversation or understood that that conversation was being held with decision makers. All right? So you're actually—counsel is absolutely right. Ms. Rigo is absolutely right. He doesn't have to know who the decision makers are, but we do. It's not relevant if you're saying to the copy guy: I really hate Giedgowd. So what. Right. In this sense, so what with Marcie Carroll. So it's out – the email is out on hearsay. The testimony as to what he told Marcie Carroll, other than there's some proof that he was speaking to people other than Marcie Carroll at the same time is out on relevance. N.T., July 26, 2021, at 18:21–19:19.

[223] Fed. R. Civ. P. 61.

[224] *McQueeny v. Wilmington Trust Co.*, 779 F.2d 916, 924–28 (3d Cir. 1985) (applying criminal harmless error standard to civil cases).

---

[225] ECF Doc No. 78-1 at 28.

[226] We analyze claims under the PHRA and ADEA using the same framework. *Willis v. UPMC Children's Hosp. of Pitt.*, 808 F.3d 638, 643 (3d Cir. 2015).

To prove age discrimination, the plaintiff must prove but-for causation. *Id.* When relying on circumstantial evidence of discrimination, the three-part burden shifting test set forth in *McDonnell Dougal Corp. v. Green*, 411 U.S. 792 (1973) applies. *Willis*, 808 F.3d at 644.

The plaintiff must first prove the prima facie case for discrimination by demonstrating: "(1) the plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment decision; (3) the plaintiff was qualified for the position in question; and (4) the plaintiff was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive." *Id.* The employer than must "articulate a legitimate nondiscriminatory reason for the adverse employment action." *Id.* "If the employer satisfied this second step, the burden shifts back once more to the plaintiff to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual." *Id.* at 644–45.

Cafaro argues Mr. Giedgowd failed to prove "but-for causation" because he only offered evidence "Cafaro did not give him a reason during the termination meeting or apprise him of his poor performance throughout his employment;" he only "presented evidence Cafaro made the wrong business decision by terminating him and retaining Mr. Ries and Ms. Conner;" and "alleging he was the oldest employee." ECF Doc. No. 78-1 at 28.

Cafaro does not argue Mr. Giedgowd failed to prove the prima facie case or any other basis than the three listed above. We will not endeavor to make any arguments for them, but note, upon our review of the trial transcripts, Mr. Giedgowd seemingly did not adduce his purported replacement—Eileen Mahoney's— age. Cafaro may not have challenged on this ground because Ms. Mahoney's age is undisputed based on Cafaro's admissions in its statement of undisputed facts to its motion for summary judgment. ECF Doc. No. 18, Appx. 0002. It is not our job to make arguments for the litigant.

[227] ECF Doc No. 79 at 23–24.

[228] ECF Doc No. 78-1 at 28.

[229] *Cortez*, 617 F.3d at 715 (quoting *Spence*, 806 F.2d at 1201).

[230] *Id.* (citing *Johansen v. Combustion Engineering, Inc.*, 170 F.3d 1320 (11th Cir. 1999)).

[231] ECF Doc. No. 77.

[232] *Id.* Title 28 U.S.C. § 1961(a) is the federal post-judgment interest rate district courts may apply in calculating prejudgment interest. *See Koch v. Mack Trucks, Inc.*, No. 16-4857, 2018 WL 2461921, at *9 (E.D. Pa. June 1, 2018).

[233] *Booker v. Taylor Milk Co., Inc.*, 64 F.3d 860, 868 (3d Cir. 1995); *see also Johnson v. Dependability Co., LLC*, No. 15-3355, 2016 WL 852038, at *3 (E.D. Pa. Mar. 3, 2016) ("Plaintiff also seeks prejudgment interest on her back pay award, which is authorized under the PHRA and ADA."); *Diaz v. Saucon Valley Manor, Inc.*, No. 12-433, 2013 WL 4564300, at *2 (E.D. Pa. Aug. 27, 2013) ("I have the discretion to award pre-judgment interest in back-pay damages under the PHRA and ADA."); *Marra v. Phila. Housing Auth.*, 404 F. Supp. 2d 839, 848 n.2 (E.D. Pa. 2005) ("Given the similarity of the goals of the available remedies under Title VII and the PHRA-to make the victims of discrimination whole-the Court will adhere to the presumption in this action under the PHRA.").

[234] *Booker*, 64 F.3d at 868.

[235] *Taxman v. Bd. of Educ. of Piscataway*, 91 F.3d 1547, 1566 (3d Cir. 1996); *Johnson*, 2016 WL 852038, at *3 (citing *Diaz*, 2013 WL 4564300, at *2).

[236] *See Taxman*, 91 F.3d at 1566 (affirming trial court's application of IRS rate); *Acosta v. Fairmount Foundry Inc.*, 391 F. Supp. 3d 395, 413–14 (E.D. Pa. 2019) (awarding prejudgment interest at IRS overpayment rate); *Middlebrooks*, 2019 WL 438092, at *22 (awarding prejudgment interest at IRS overpayment rate); *Security and Data Tech., Inc. v. Sch. Dist. of Phila.*, No. 12-2392, 2016 WL 7427758, at *21 (E.D. Pa. Dec. 20, 2016) (awarding prejudgment interest to plaintiff in action under 42 U.S.C. § 1981 at IRS overpayment rate); *Johnson*, 2016 WL 852038, at *3–4 (E.D. Pa. Mar. 3, 2016) (awarding prejudgment interest as appropriate in ADA case at IRS overpayment rate)*; Marra*, 404 F. Supp. 2d at 848 n.2 (awarding prejudgment interest on back pay award at IRS rate in Title VII and PHRA claims).